## COMMONWEALTH vs. AARON J. SONDRINI.

No. 98-P-1396.

Berkshire. January 7, 2000. - March 3, 2000.

Present: GREENBERG, KAPLAN, & RAPOZA, JJ.

*Search and Seizure,* Warrant, Exigent circumstances. *Constitutional Law,*
Search and seizure.

Where, in the course of investigating a water leak in an apartment building, a
police officer noticed drug-related paraphernalia through an open window,
a search warrant was required to enter to search for and secure any
contraband [705-707]; moreover, there was, in the circumstances, no
emergency warranting any further action than entry to contain the source
of the leak [707-708].

COMPLAINT received and sworn to in the Pittsfield Division of
the District Court Department on July 21, 1995.

A pretrial motion to suppress evidence was heard by *Alfred
A. Barbalunga,* J., and the case was heard by him.

*Jennifer R. DeFeo* for the defendant.

*Joseph A. Pieropan,* Assistant District Attorney, for the Com-
monwealth.

KAPLAN, J. The defendant appeals from his conviction of
manufacturing, distributing, or dispensing a class D substance,
marijuana, in violation of G. L. c. 94C, § 32C(*a*). The convic-
tion will be reversed because the District Court judge erred in
failing to suppress the material evidence that was obtained by
means of an unlawful warrantless search.

We follow the judge's findings of fact, adding a few
unexceptional circumstances drawn from the hearing on the
suppression motion. On the morning of June 23, 1995, the
Keefes, tenants of the first-floor apartment at 77 Onota Street,
Pittsfield, saw water leaking through one of their ceiling light
fixtures. Firemen arrived on call. Hearing dogs barking in the
second-floor apartment, which was the evident source of the

leak, the firefighters called the city's animal control office to deal with the dogs. The time was now 9:30 A.M. Joseph Chague, an animal control officer, arrived; following routine, he called for police backup. Pittsfield police officer Paul Therrien appeared. The Keefes showed Chague and Therrien the ceiling leak. Mrs. Keefe said the two dogs upstairs were as harmless as kittens; she offered to take them in hand herself. Mr. Keefe showed the way to a fire escape and second-floor window by which the men could enter the apartment.

Chague climbed the fire escape, followed by Therrien. They looked into a room visible through the open window. The dogs were not there but their barking continued.

At this point Chague noticed a "bong" (a pipe-like apparatus used to smoke marijuana) on a table in the room. He pointed this out to Therrien. Thereupon Therrien called the police station and asked for a detective or superior officer to attend. Meanwhile Chague and Therrien remained out on the fire escape.

No detective was available but Sergeant Case made the trip to the scene. Now Sergeant Case, Chague, and Therrien, in that order (with firefighters evidently to follow) entered the room through the window. The room is described as "spare." There were doors (closed) on either side of a corner of the room, the one on the left smaller than the other.[1] Sergeant Case opened the smaller door, revealing a closet in which there was an "aquarium" of several marijuana plants with overhanging heat lamps. Case called for detective help, it seems from the drug unit. He opened the second door. The dogs were loitering in the hallway off that door and proved friendly, as had been foretold.

Detective Joseph Collias, responding to Case's call, took pictures of the closet and removed the contents.

A puncture in a waterbed was responsible for the ceiling leak.

No warrant for the search was applied for or issued. Nor was the defendant Sondrini, the second-floor resident, informed of the trouble until he returned home after his workday.

1. The motion judge explained his decision simply by quoting the last sentence of the paragraph in the majority opinion in *Cady* v. *Dombrowski*, 413 U.S. 433, 441 (1973) (5-4 decision),[2]

---

[1]The defendant testified that the smaller door could be recognized from the outside as a closet door.

[2]*Cady* involved a vehicle not in custody or on the premises of the owner

that reads as follows:

> "Because of the extensive regulation of motor vehicles and traffic, and also because of the frequency with which a vehicle can become disabled or involved in an accident on public highways, the extent of police-citizen contact involving automobiles will be substantially greater than police-citizen contact in a home or office. Some such contacts will occur because the officer may believe the operator has violated a criminal statute, but many more will not be of that nature. *Local police officers, unlike federal officers, frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute*" (emphasis supplied).

We surmise that the judge reached his conclusion, ostensibly within the *Cady* formulation, by conceiving that the police were carrying out a "community caretaking function" (assisting in the pursuit of the ceiling leak) in the course of which they happened, accidentally and guilelessly, upon evidence of a crime (marijuana culture). Indeed, the Commonwealth propounds such a scenario. This, however, is a misinterpretation of the facts calculated to evade the standard of the Fourth Amendment to the United States Constitution which this appellate court is bound to guard and apply. See *Commonwealth* v. *Alvarado*, 420 Mass. 542, 544 (1995); *Commonwealth* v. *Ramos*, 430 Mass. 545, 546 (2000). The police activity at the very beginning of the episode may as well be viewed as community caretaking.[3] When, however, Officer Therrien sighted the bong, he regarded

that had been taken into lawful custody of police officers; they opened and searched the trunk, believed to contain a gun and vulnerable to intrusion by vandals. *Id.* at 447-448.

[3]There was occasion to discuss the community caretaking "exception" in *Commonwealth* v. *Leonard*, 422 Mass. 504, 506-509, cert. denied, 519 U.S. 877 (1996), and *Commonwealth* v. *Canavan*, 40 Mass. App. Ct. 642, 645-647 (1996). See *United States* v. *Rodriguez-Morales*, 929 F.2d 780, 784-787 (1st Cir. 1991), cert. denied, 502 U.S. 1030 (1992). For purposes of the present case we assume for the benefit of the Commonwealth that the caretaking, so-called, can extend to entrance into a residence, although there is some opinion that its field of operation is the situations of diminished expectations of

himself immediately as involved in "the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute" (to return to the passage from *Cady*), whence followed the call answered by Sergeant Case and so on to a warrantless search that disclosed the drug. Here the police erred. Finding the dogs and the source of the ceiling leak and curing it could be left to the animal control officer and the firefighters; to validate the search for the drugs, the police must apply for and secure a search warrant.[4] To revert again to the *Cady* text, here the community caretaking, such as it was, was surely *not* "totally divorced from the detection," etc., and thus any privilege inherent in the mere caretaking was later lost.[5]

2. The Commonwealth departs from the position taken by the motion judge to try to invoke an "emergency" or "exigency" exception to legitimate the action of the police. The facts would not support an "emergency" characterization as that term is defined for the purpose by the Constitution and the cases, see *Commonwealth* v. *Bates*, 28 Mass. App. Ct. 217, 219-220 (1990): the ceiling leak evidently was not a miniature Niagara; the actors were not stirred to make an immediate entry but marked time awaiting reinforcements, the interval lasting, we are told, not less than an hour. But if this could be called an emergency, it might legitimate an initial entry, but not the search, as shown *supra,* point 1.

We conclude by recalling that warrantless searches are presumptively illegal, and further:

> "The circumstances that have been recognized as justifying failure to obtain a warrant have been severely circumscribed by the courts as being both few, *Katz* v.

privacy, such as intrusion into automobiles. See *United States* v. *Pichany*, 687 F.2d 204, 209 (7th Cir. 1982); *United States* v. *Erickson*, 991 F.2d 529, 532-533 (9th Cir. 1993), and note the reference to motor vehicles in the paragraph from *Cady* quoted in our text above.

[4]We reserve a doubt whether observing the presence of the bong would furnish probable cause for the issuance of a warrant for search of the premises. But if it would supply probable cause, the police were still required to seek a warrant, for it is not shown that dissipation of any evidence in the time involved was threatened or could not be guarded against. See *Commonwealth* v. *DiGeronimo*, 38 Mass. App. Ct. 714, 725-726 (1995).

[5]Compare our cases on administrative searches, where once police purposes shift from the original benign object to a quest for evidence of crime, a warrant on probable cause has to be obtained. See *Commonwealth* v. *Frodyma*, 386 Mass. 434, 445 (1982); *Commonwealth* v. *Tremblay, ante* 454, 462 (2000).

*United States*, 389 U.S. 347, 357 (1967), and exceptional, *G.M. Leasing Corp.* v. *United States*, 429 U.S. 338, 352-353, 358 (1977). The Supreme Court of the United States has also observed that the few exceptions are 'jealously and carefully drawn,' *Jones* v. *United States*, 357 U.S. 493, 499 (1958), and that the government's 'heavy burden' in such cases, *Welsh* v. *Wisconsin*, 466 U.S. [740,] 749-750 [1984], is to show that, even within the few, narrow exceptions, proceeding without a warrant was 'imperative.' *McDonald* v. *United States*, 335 U.S. 451, 456 (1948)."

*Commonwealth* v. *DiGeronimo*, 38 Mass. App. Ct. 714, 721 (1995).

As the evidence at the bench trial that followed the suppression hearing consisted only of the evidence at the hearing, the finding of guilt is set aside, the judgment is reversed, and judgment is to enter for the defendant.

*So ordered.*