COMMONWEALTH *VS.* MICHAEL P. GENTILE.

Plymouth. May 10, 2002. - August 20, 2002.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, & COWIN, JJ.

*Practice, Criminal,* Motion to suppress, Argument by prosecutor, Assistance of counsel, Capital case. *Search and Seizure,* Probable cause, Warrant. *Constitutional Law,* Search and seizure, Probable cause, Assistance of counsel. *Probable Cause.*

A warrantless seizure by police of a criminal defendant's truck and clothing was permissible where the police, who were investigating a woman's disappearance, had probable cause to believe that evidence that the defendant had kidnapped or otherwise harmed the missing woman might be found in the truck; where the police had acted properly in seizing the truck to avoid any loss or destruction of evidence while they obtained a search warrant; and where the police had probable cause to believe that drugs or evidence of drug activity would be found in the truck. [573-577]

An affidavit in support of an application for a search warrant provided both probable cause for a magistrate to conclude that a missing woman had been kidnapped and that evidence related to her disappearance would be found in a truck owned by the defendant, and probable cause to support a search warrant to search the truck for evidence of marijuana possession. [577-579]

At a murder trial, certain statements by the prosecutor in closing argument were either proper, unlikely to have had any effect on the outcome of the trial, or, if improper, did not create a substantial likelihood of a miscarriage of justice. [579-581]

There was no merit to claims by the defendant in a murder case that his trial counsel had provided ineffective assistance. [581-583]

INDICTMENT found and returned in the Superior Court Department on September 3, 1999.

Pretrial motions to suppress evidence were heard by Richard J. Chin, J., and the case was tried before him.

*Robert S. Sinsheimer* for the defendant.

*Gail M. McKenna,* Assistant District Attorney, for the Commonwealth.

COWIN, J. The defendant was convicted by a jury of murder in the first degree on theories of deliberate premeditation,

extreme atrocity or cruelty, and felony-murder (with aggravated rape as the predicate felony). On appeal, he claims that (1) the judge erred in failing to allow his motion to suppress evidence because (a) his truck and clothing were unlawfully seized; and (b) a warrant later issued to search the truck was not supported by probable cause; and (2) the prosecutor's closing argument was improper. The defendant also requests that we exercise our extraordinary power under G. L. c. 278, § 33E, to order a new trial. We affirm the conviction and decline to exercise our power under G. L. c. 278, § 33E.

1. *Facts.* We outline as general background the following facts which the jury could have found. On July 11, 1999, the victim went biking in the Sagamore Recreational Area on Cape Cod. When she was unable to start her automobile to return home, she accepted a ride with the defendant in his truck. The defendant agreed to drive her to the Carlton House in Brockton where she planned to meet her mother and stepfather at about 9 P.M. The victim never arrived at that location and was never heard from again. Her body was discovered eight days later in a swampy section of Pembroke. She had been raped and murdered. Cellular telephone records and procedures indicated that the defendant placed a telephone call from Pembroke shortly after 9 P.M. on the evening of the victim's disappearance. The defendant made incriminating statements to a friend and to his sister. A mixture of the victim's blood and the defendant's semen was discovered on a tarpaulin in the cab of the defendant's truck, as well as on the victim's bathing suit.

2. *Motion to suppress.* We summarize the relevant facts as found by the motion judge, supplemented by uncontested testimony from the motion hearing. The victim's mother, father, and stepfather reported to the Brockton police at about 12:30 A.M. on July 12, 1999, that the victim was missing. They informed the police that when the victim was unable to start her car to return home from biking on Cape Cod, she telephoned her mother and stepfather at approximately 7 P.M. using a man's cellular telephone. The man had attempted to repair the victim's car, and, when unsuccessful, telephoned a friend who also attempted to repair the car, but was unable to do so. The man who originally offered to help the victim gave her a ride.

During a series of telephone calls, all made on the man's cellular telephone, the victim told her mother that the man would drive her to the Carlton House in Brockton. Her mother and stepfather arranged to meet her there at 9 P.M. The last call from the victim was received at about 9 P.M. The victim said that she would telephone again when she was closer to Brockton. The victim did not telephone again and did not arrive at the Carlton House as planned. The victim's mother reported that the victim normally telephoned twice a day and that, if the victim were in trouble, she would call her mother if possible. Her parents also stated that when the victim did not arrive as scheduled, they telephoned the cellular telephone (the victim had given them the number) but no one answered.

In speaking with the owner of the cellular telephone, Robert Shaw, the police discovered that the telephone was in the possession of the defendant, an employee of Shaw. They learned the defendant's personal identifying information; that the defendant called Shaw at 9 P.M. on July 11 and told him that he was unable to report to work because his truck had broken down in Boston; and that the defendant had previously been accused of stalking and making obscene telephone calls to a woman. The police attempted unsuccessfully to locate the defendant at his home and various other locations. They also were unable to reach him on his cellular telephone.

Learning that the police were looking for him, the defendant went to the Bourne State police barracks at approximately 7 A.M. and spoke with Sergeant Alan Garcia. The defendant refused to enter the barracks and stated that they could speak in the lobby. After the defendant was given his Miranda rights, Garcia asked whether he knew the victim's whereabouts. The defendant described the victim's car troubles and stated that he eventually agreed to give her a ride to Brockton and that she had purchased ten dollars of gasoline for his truck. The defendant claimed that he became lost, believed he was running low on gasoline, and dropped the victim off in Kingston between 8 and 10 P.M. The defendant refused to identify his friend who helped him with the victim's car. He also stated that he and the victim had smoked marijuana together and claimed that, after dropping off the victim, he went to the Plymouth bus station where he slept all night.

The officer asked the defendant for permission to look inside his truck. The defendant agreed and opened the driver's side door and stated, "See, look," and slammed the door shut. The defendant repeated this action with the rear hatch covering the truck. The officer then asked if he could search the truck; the defendant refused, stating that he had a "pot pipe" in the truck and could be arrested. At approximately 9 A.M., the defendant asked if he could leave the barracks and was told that he was free to leave, but that the truck had to remain. The defendant went to the truck, locked the doors, and slammed them shut. He stated that if the police wanted to get inside, they would have to break into the truck.

Sergeant William Burke arrived at the Bourne barracks at 9 A.M. to supervise the investigation. After contacting his attorney on his cellular telephone, the defendant refused to give a statement to Burke. Burke told the defendant that he was free to leave but that his truck needed to remain at the barracks. The defendant asked if he could remove something from the truck and was told that he could not. When the defendant was informed that the police were going to obtain a search warrant for the truck, the defendant stated that he would wait, and asked Burke what they were going to find in the truck. Burke responded that they would find out whether something bad had happened to the girl in the truck. The defendant did not respond, but closed his eyes and dropped his head. The defendant told Burke that a person cannot be reported missing until after twenty-four hours elapsed. Burke remarked that the defendant watched too much television and that a person could be reported missing at any time. The defendant then said, "Do you think I'm stupid? I let her use my cell phone, do you think I'd kill her?"

Another State trooper pointed out to Burke a discoloration on the defendant's pants. Burke then noticed a scabbed gouge on the defendant's right bicep and a scratch that looked red and fresh. At approximately 5 P.M., the defendant stated that he wanted to leave and was told that he was free to leave, but the police were going to take his clothes. The defendant was given a change of clothes and then left the barracks. Search warrants were obtained for the defendant's truck and clothing.

In reviewing a ruling on a motion to suppress evidence, we accept the judge's subsidiary findings of fact absent clear error. The weight and credibility to be given testimony is for the judge. See *Commonwealth* v. *Yesilciman*, 406 Mass. 736, 743 (1990), and cases cited. "[W]e give substantial deference to the judge's ultimate findings and conclusions of law, 'but independently review[] the correctness of the judge's application of constitutional principles to the facts found.' " *Commonwealth* v. *Eckert*, 431 Mass. 591, 593 (2000), quoting *Commonwealth* v. *Magee*, 423 Mass. 381, 384 (1996).

When the defendant stated that he wished to leave the barracks, the police told him that he was free to leave, but that he could not take his truck with him. The defendant argues that this warrantless seizure of his truck was unconstitutional. Warrantless seizures are permissible in certain circumstances. With probable cause, the police may seize property "to prevent destruction or removal of evidence during the relatively short period of time needed . . . to obtain a search warrant." *Commonwealth* v. *Taylor*, 426 Mass. 189, 195 (1997). *Commonwealth* v. *Martino*, 412 Mass. 267, 275-277 (1992) (police secured defendant's home pending issuance of warrant). "In dealing with probable cause . . . as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Commonwealth* v. *Cast*, 407 Mass. 891, 895-896 (1990), quoting *Draper* v. *United States*, 358 U.S. 307, 313 (1959). "The officers must have entertained rationally 'more than a suspicion of criminal involvement, something definite and substantial, but not a prima facie case of the commission of a crime, let alone a case beyond a reasonable doubt.' " *Commonwealth* v. *Santaliz*, 413 Mass. 238, 241 (1992), quoting *Commonwealth* v. *Rivera*, 27 Mass. App. Ct. 41, 45 (1989). "The test is an objective one." *Commonwealth* v. *Santaliz, supra*, and cases cited.

The police seizure of the truck was grounded firmly in probable cause to believe that evidence that the defendant kidnapped or otherwise harmed the victim might be found in the truck. By 9 A.M., the police knew that a young woman who normally telephoned her mother at least twice a day and was in continu-

ous telephone contact with her mother and stepfather immediately prior to her disappearance was missing and had not spoken with her mother for about twelve hours. When the victim was last heard from, she had been with the defendant, in his truck, allegedly driving from Cape Cod toward Brockton where she planned to meet her mother and stepfather at about 9 P.M. She had planned to telephone when she was closer to Brockton. The victim never made the scheduled call or appeared at the appointed location. It was uncharacteristic of her not to telephone if she were in trouble. When the victim's family tried to contact her on the defendant's cellular telephone (whose number the victim had given them), there was no answer. The defendant was the last person to have seen the victim. He had a criminal record and was described by his employer as suspected of stalking a woman and making obscene telephone calls to her. The defendant refused to provide the police with the name of his friend whom he said had tried to repair the victim's car on Cape Cod.

Many statements that the defendant made to the police and others were inconsistent, false, or implausible. He had telephoned his boss at about 9 P.M., reporting that his truck had broken down in Boston and that he was thus unable to deliver papers on the Cape that night. This was contradicted by the defendant's own statements to the police concerning his whereabouts on the previous night. The defendant told the police that he drove the victim to the bus stop in Plymouth before going to Brockton, but the victim told her family that he was driving her directly to Brockton. The defendant's statement that he left the victim in Kingston because he was low on gasoline was inconsistent with the fact that the victim had paid ten dollars for gasoline for his truck. His alleged alibi, that he was sleeping at the Plymouth bus station all night, was contradicted by the report of a State trooper who had patrolled the area that night looking for the defendant, his truck, or the victim but had not seen either the people or the vehicle. The approximately eight hours for which the defendant could not account was ample opportunity for him to have harmed the victim and disposed of her body and incriminating evidence.

The judge correctly concluded that this information provided

the police with probable cause to seize the defendant's truck. See *Commonwealth* v. *Donahue*, 430 Mass. 710, 712 (2000), quoting *Commonwealth* v. *Cinelli*, 389 Mass. 197, 213, cert. denied, 464 U.S. 860 (1983) ("[T]he nexus between the items to be seized and the place to be searched need not be based on direct observation . . . [but] . . . [t]he nexus may be found in 'the type of crime, the nature of the missing items, the extent of the suspect's opportunity for concealment, and normal inferences as to where a criminal would be likely to hide [evidence of the crime]' "); *Commonwealth* v. *Beldotti*, 409 Mass. 553, 557-558 (1991) (where defendant was last person known to be with victim and he had driven his vehicle day of murder, probable cause existed to believe that evidence concerning crime would be found in his house where vehicle was parked).

As the judge also concluded, the police acted properly in seizing the truck to avoid any loss or destruction of evidence while they obtained the search warrant. There was reason to believe that the defendant's truck might hold traces of a struggle or evidence relative to the manner of the victim's disappearance. Had the defendant been permitted to leave the barracks with his truck, there was a risk that he might have destroyed any such evidence. (The defendant was aware of police suspicion of him and had refused to permit the police to examine his truck.) "The situation at the time of detention is analogous to the securing of a place to be searched to prevent destruction or removal of evidence during the relatively short period of time needed by the police to obtain a search warrant." *Commonwealth* v. *Taylor*, 426 Mass. 189, 195 (1997).[1]

The defendant argues that probable cause was lacking because the evidence in this case was not as strong as that supporting

---

[1]The defendant's suggestion that it was not a "relatively short period of time" between the initial seizure of the truck and the time at which the application for the search warrant was presented to the magistrate, *Commonwealth* v. *Taylor*, 426 Mass. 189, 195 (1997), is raised for the first time on appeal. We consider whether there has been a substantial likelihood of a miscarriage of justice, see *Commonwealth* v. *Lyons*, 426 Mass. 466, 471 (1998), and cases cited. Each case must be decided on its own peculiar facts. The initial seizure of the truck was at approximately 9 A.M. The application was presented to the magistrate at 7 P.M. This passage of time in the circumstances of this case did not create a substantial likelihood of a miscarriage of justice.

the affidavit for a search warrant in *Commonwealth* v. *Donahue, supra.* The issue is not the comparative strength of the evidence, but whether the evidence here was sufficient to support a finding of probable cause. Not only did probable cause exist; the police would have been derelict if they had not acted to immobilize the truck and seek a search warrant.

The police also had probable cause to search the truck for evidence of a second crime: possession of marijuana. See G. L. c. 94C, § 34. Probable cause existed to believe that drugs or evidence of drug activity would be found in the defendant's truck. The defendant stated that he and the victim had smoked marijuana together and that there was a "pot pipe" in the truck. The defendant refused to permit the police to search the truck.

Because seizure of the truck was permissible on this ground, whether the police also suspected the defendant of another crime is irrelevant. *Commonwealth* v. *Santana*, 420 Mass. 205, 209 (1995), quoting *United States* v. *Trigg*, 878 F.2d 1037, 1041 (7th Cir. 1989), cert. denied sub nom. *Cummins* v. *United States*, 502 U.S. 962 (1991) ("it is irrelevant whether a reasonable police officer would have made the stop but for the unlawful motive; the stop is valid 'so long as the police are doing no more than they are legally permitted and objectively authorized to do' "). See *Commonwealth* v. *Petrillo*, 399 Mass. 487, 490 (1987) (arrest for motor vehicle trespass that allowed search of automobile not invalidated because police officer aware arrestee was suspected of dealing drugs); *Commonwealth* v. *Matchett*, 386 Mass. 492, 510 (1982), quoting *Commonwealth* v. *Tisserand*, 5 Mass. App. Ct. 393, 386-387 (1977) ("taking an inventory of the contents of a car about to be towed or impounded is a reasonable procedure; and the fact that the searching officer may have harbored a suspicion that evidence of criminal activity might be uncovered as a result of the search should not vitiate his obligation to conduct the inventory"); *Commonwealth* v. *Ceria*, 13 Mass. App. Ct. 230, 235 (1982), quoting *Scott* v. *United States*, 436 U.S. 128, 138 (1978) ("police conduct is to be judged 'under a standard of objective reasonableness without regard to the underlying intent or motivation of the officers involved' "). See also *Commonwealth* v. *Santana, supra* at 207-208. Logic supports those results; it makes no sense to rule that

the police may search the vehicle of a person who admits to possession of marijuana (or weapons), but not the vehicle of one who admits to such an offense, but is also suspected of a more serious crime. See *id.* at 210 n.3 ("defendants' contention might yield the illogical result of allowing stops of nonsuspect drivers who violate motor vehicle laws, but forbidding stops of suspected criminals who violate motor vehicle laws").

Pursuant to the same principles that apply to the seizure of the truck based on probable cause to believe that evidence related to the kidnapping or harming of the victim might be found therein, the judge also correctly concluded that the warrantless seizure of the defendant's clothing was supported by probable cause. The seizure was justified by the facts set forth above supplemented by the fact that the police observed a stain they believed to be blood on the defendant's pants. Moreover, if the police did not seize the clothing prior to obtaining a warrant, the defendant would have left the police station; the clothing would likely be washed and the evidence lost or dissipated. See *Commonwealth* v. *Taylor*, 426 Mass. 189, 195 (1997).

The defendant further argues that the judge erred in concluding that the affidavit supporting the application for the search warrant for his truck established probable cause.[2] The argument has no merit. To establish probable cause to search, "[a]n affidavit must contain enough information for an issuing magistrate to determine that the items sought are related to the criminal activity under investigation, and that they reasonably may be expected to be located in the place to be searched at the time the search warrant issues." *Commonwealth* v. *Cinelli*, 389 Mass. 197, 213 (1983). All reasonable inferences that may be drawn from the information in the affidavit may also be considered in determining whether probable cause has been established. See *Commonwealth* v. *Smith*, 370 Mass. 335, 342-343, cert. denied, 429 U.S. 944 (1976), and cases cited; *Commonwealth* v. *Stewart*, 358 Mass. 747, 751-752 (1971).

The affidavit provided probable cause to believe that two separate crimes had been committed and that evidence of those

---

[2] In the heading of this section of his argument, the defendant also states that the affidavit did not provide probable cause for the search of his clothing; however, he makes no argument in this regard.

crimes would be located within the defendant's truck and on his clothing. The police suspected that the defendant had kidnapped the victim.[3] The facts that were recited above in connection with the motion to suppress were repeated in the affidavit (with minor insignificant differences). The affidavit also contained the following additional details: Although the defendant had stated that he left the victim at a Dunkin Donuts in Kingston, when the two employees of the shop were interviewed by State police, neither had seen the victim. Business was reportedly slow that night and a large plate glass window provided a view of the parking lot. The defendant's friend, located by the police from information provided by the defendant's sister, confirmed that he had tried to help the victim start her car and that the defendant had offered to drive the victim to a bus stop. The defendant had left muddy boots and socks and two bags in his sister's basement (where he lived) early in the morning following the victim's disappearance. Cellular telephone records indicated that the defendant had been in the Bridgewater area[4] when he telephoned Robert Shaw and not in Boston as he had stated.

[3] The affidavit in support of the application for the search warranted recited that there was probable cause to believe that evidence of the specific crimes of kidnapping and possession of a class D controlled substance (marijuana) would be located in the defendant's truck.

[4] The fact that the affidavit stated that cellular telephone records indicated that the defendant had been in the Bridgewater area appears to conflict with the trial testimony, summarized *supra* at 570, that cellular telephone records and procedures indicated that the defendant placed a telephone call from Pembroke shortly after 9 P.M. on the evening of the victim's disappearance. There is no discrepancy in fact. At the time the affidavit was prepared, the police were aware only of the cellular telephone records indicating the call had been placed from the Bridgewater area. By the time of trial, the police had tested the placement of cellular telephone calls and were able to determine that a call made from the Pembroke area would appear on cellular telephone records as originating from the Bridgewater area.

The victim's body was discovered in Pembroke. The fact that a call had been placed by the defendant from the Bridgewater area at the time that the victim disappeared was therefore relevant if Bridgewater is located near Pembroke. Pembroke is a short distance from Bridgewater. Although that geography was not set forth in the affidavit and the magistrate may not consider facts not contained in the affidavit, *Commonwealth* v. *Robles*, 423 Mass. 62, 66 (1996), he may apply common knowledge and draw "a common sense conclusion from the information set forth in the affidavit." *Commonwealth* v. *Taglieri*, 378 Mass. 196, 199, cert. denied, 444 U.S. 937 (1979).

The judge correctly concluded that, under the standard governing the sufficiency of an affidavit supporting an application for a search warrant, see *Commonwealth* v. *Jean-Charles*, 398 Mass. 752, 757 (1986), there was probable cause for a magistrate to conclude that the victim had been kidnapped and that evidence related to her disappearance would be found in the defendant's truck.

Second, as stated above, the defendant's admission that he had smoked marijuana with the victim and that his "pot pipe" was in the truck provided probable cause to support the search warrant to search the truck for evidence of marijuana possession. Although the defendant seeks support for his argument that probable cause for the affidavit was lacking from *Commonwealth* v. *Sondrini*, 48 Mass. App. Ct. 704, 707 n.4 (2000), his reliance is misplaced. The footnote states: "We reserve a doubt whether observing [in the defendant's apartment] the presence of the bong [a pipe-like apparatus used to smoke marijuana] would furnish probable cause for the issuance of a warrant for search of the premises." There is a significant factual distinction between the *Sondrini* case and the present case. There is no evidence in the *Sondrini* case that the "bong" was in fact used for smoking marijuana, particularly at the premises in question. In the present case, the defendant admitted to smoking marijuana and implied that the evidence of that crime would be in his truck. The defendant's contention that the "pot pipe" was used as a pretext to obtain a warrant to search for evidence of another crime is resolved by our previous discussion on this issue.

3. *Closing argument.* The defendant challenges three statements in the prosecutor's closing argument. He contends that the prosecutor improperly commented that (a) the victim "didn't deserve to die this way"; (b) the burden of proof is the "price that we pay for living in a free, democratic society"; and (c) the defense strategy was "despicable." None of the challenged remarks was the subject of an objection. Thus we examine whether any of the statements were improper and, if so, whether

"Such common knowledge would include awareness of the general features of the area." *Commonwealth* v. *Labelle*, 15 Mass. App. Ct. 175, 179 (1983).

the impropriety created a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Frank*, 433 Mass. 185, 195 (2001).

(a) The prosecutor's statement that the victim "didn't deserve to die this way" was improper.[5] The statement has no relevance in determining whether this defendant was the killer; it merely appealed to the jury to convict the defendant because of the atrocious nature of the killing. See *Commonwealth* v. *Barros*, 425 Mass. 572, 582 (1997) ("right to live" argument inappropriate).

Although the statement was improper, it did not create a substantial likelihood of a miscarriage of justice. The evidence, summarized earlier, was very strong. Moreover, the judge instructed the jury both at the outset of the trial and in his final instructions that arguments of counsel are not evidence. We presume that the jury follow the judge's instructions. *Commonwealth* v. *Degro*, 432 Mass. 319, 328 (2000). It is unlikely that this improper statement would have made a difference. *Commonwealth* v. *Roberts*, 433 Mass. 45, 55 (2000).

(b) Another challenged statement is the prosecutor's remark that he "welcome[d] the burden of proof, proof beyond a reasonable doubt . . . [t]hat . . . is the price we pay for living in a free, democratic society." The first statement was essentially an acknowledgment of the Commonwealth's obligation. The second sentence was a purposeless rhetorical flourish with the danger of all such irrelevancies, and it was better left unsaid. Its impact was not such that it likely had any effect on the outcome.

(c) The last statement of which the defendant complains is

---

[5]Both parties' briefs state that this remark was the subject of an objection. The transcript indicates only that at the close of the arguments the defendant filed a motion for a mistrial and said that he objected to the closing as "misstating the evidence . . . overly sympathetic . . . and in fact played upon the sympathies of the jurors." These statements did not alert the judge to any particular remarks of the prosecutor and are not sufficient to preserve the defendant's rights. See *Commonwealth* v. *Fowler*, 431 Mass. 30, 41-42 & n.19 (2000) ("Because the defendant did not properly object to . . . the closing argument, we review the errors to determine whether a substantial likelihood of a miscarriage of justice exists"). See also *Commonwealth* v. *Awad*, 47 Mass. App. Ct. 139, 143 n.2 (1999) (trial counsel need not achieve perfection in identifying impropriety or in offering alternative so long as objection alerts judge to basis of counsel's complaint and gives court opportunity to correct error).

that the prosecutor labeled "despicable" the defense strategy of accusing three other people of committing this crime. Although we have said (in reference to a statement that defense counsel "belittle[d]" the witnesses) that the "prosecutor may comment on defense tactics that the jurors have witnessed themselves," *Commonwealth* v. *Roberts, supra* at 56, citing *Commonwealth* v. *Jackson*, 428 Mass. 455, 463-464 (1998), calling the defense strategy "despicable" was more than a "comment." It was a disparagement of the defense. The statement also exceeds that permitted in *Commonwealth* v. *Simpson*, 434 Mass. 570, 586 (2001) (not improper to label defense argument "insult" where "remark was designed to demonstrate the lack of evidence to support the self-defense claim"). Characterizing the defense tactic as "despicable" goes beyond labeling it as unworthy of belief or lacking in merit and smacks more of an ad hominem attack. However, because of the strength of the evidence and the judge's instructions to the jury, it is unlikely that this improper remark made a difference in the jury's conclusion. *Commonwealth* v. *Roberts, supra* at 55.

4. Moffett *issues*. Pursuant to *Commonwealth* v. *Moffett*, 383 Mass. 201, 216 (1981), the defendant also makes three further claims that we now examine.

The defendant maintains that trial counsel was ineffective for failing to investigate the possibility that marks on the victim's body were the result of "drug induced Lupus." The autopsy results indicated that there were no prescription or other drugs in the victim's system at the time of death. There is no basis in the evidence for suggesting that the victim suffered from Lupus, "drug induced" or otherwise. Thus, the defendant's claim is speculative. The defendant has not shown that further investigation in this regard would have accomplished "something material for the defense." *Commonwealth* v. *Satterfield*, 373 Mass. 109, 115 (1977).

The defendant next complains that trial counsel was ineffective for failing to have the victim's shorts tested to determine if the blood on them revealed "epithelial cells" and for not arguing that the government failed to perform such tests. (The medical examiner testified that "epithelial cells" are "shedded off in blood" during menstruation.) An issue in the case was whether

the victim was menstruating at the time of the crime. The defendant had stated to a friend that she was, apparently to explain why blood consistent with her blood might be found on his clothing or items in his truck. But all the evidence indicated that the victim was not menstruating at the time of her murder. There was testimony that the victim had a medical condition that prevented her from menstruating. Further, the victim's blood that was found mixed with the defendant's semen on the tarpaulin in the defendant's truck did not contain epithelial cells. Finally, the medical examiner found no evidence of menstruation. In an attempt to explain the inconsistency between the defendant's version of events (consensual intercourse) and the physical evidence (blood), defense counsel argued in closing that the victim bled after intercourse and that the defendant assumed that it was menstrual blood. It was not ineffective to avoid tests that would likely support the Commonwealth's position. Cf. *Commonwealth* v. *Burke*, 414 Mass. 252, 258 (1993).

Finally, the defendant claims that the victim's diaries found in the proximity of her body should have been disclosed to the defendant and that he could have used this evidence to ascertain "the real killer." As an initial matter, the diaries were disclosed to defense counsel; his statement to the judge during argument on a motion in limine indicates that he had had access: "In the diary, it certainly shows . . . ." To the extent the defendant is contesting the judge's decision, the judge correctly excluded their use pursuant to the rape-shield statute. See G. L. c. 233, § 21B.[6] The purpose for which the defendant proposed to use the diaries is precisely what the statute seeks to prevent. Defense counsel asserted that the diaries would indicate that the victim was not "adverse to having sex," and would rebut the Com-

---

[6]General Laws c. 233, § 21B, provides in relevant part: "Evidence of specific instances of a victim's sexual conduct in such an investigation or proceeding shall not be admissible except evidence of the victim's sexual conduct with the defendant or evidence of recent conduct of the victim alleged to be the cause of any physical feature, characteristic, or condition of the victim; provided, however, that such evidence shall be admissible only after an in camera hearing on a written motion for admission of same and an offer of proof. If, after said hearing, the court finds that the weight and relevancy of said evidence is sufficient to outweigh its prejudicial effect to the victim, the evidence shall be admitted; otherwise not."

monwealth's contention that the victim "would not have had sex" with the defendant. It is settled that "the victim's consent to intercourse with one man does not imply her consent in the case of another." *Commonwealth* v. *Houston*, 430 Mass. 616, 621-622 (2000) (Marshall, C.J., concurring), quoting *Commonwealth* v. *Joyce*, 382 Mass. 222, 227 (1981). "The rape-shield statute . . . prevents a defendant in a rape case who claims consent from putting the complainant on trial by raising collateral issues of little or no probative value concerning the complainant's alleged predisposition for promiscuity." *Commonwealth* v. *Houston, supra* at 621 (Marshall, C.J., concurring). Although this was not a "rape case," aggravated rape was the predicate offense for the felony-murder charge.

5. *Relief pursuant to G. L. c. 278, § 33E.* After reviewing the entire record, we conclude that there is no reason to reverse the murder conviction or to grant the defendant a new trial.

*Judgment affirmed.*