## COMMONWEALTH *VS.* PETER J. CHONGARLIDES.

No. 00-P-1144 & 00-P-1160.

Nantucket. January 17, 2001. - August 27, 2001.

Present: RAPOZA, SMITH, & GILLERMAN, JJ.

*Search and Seizure,* Affidavit, Probable cause. *Probable Cause. Constitutional Law,* Search and seizure, Probable cause. *Practice, Criminal,* Admissions and confessions. *Evidence,* Admissions and confessions.

An affidavit of a State trooper accompanying an application for a warrant to search a certain location for both drugs and physical evidence relating to the death of the victim of a homicide failed to establish probable cause for the search of the location, where the affidavit failed to recite facts that established a substantial basis for concluding that the defendant was in possession of drugs or drug paraphernalia at the location [369-371], and where the facts in the affidavit failed to provide a substantial basis for concluding that evidence connected with the victim's death would be found at that location. [371-372].

In a criminal case, the judge did not err in denying the defendant's motion to suppress statements made by the defendant during an interview at a police station, after an arrest at a certain location and incident to an unlawful police search conducted without probable cause, where the defendant willingly spoke with police after being read Miranda warnings a second time, where a sufficient time interval existed to insulate inculpatory statements ultimately made by the defendant from the taint of any illegality involving prior police conduct, and where any prior police illegality was not purposeful or flagrant. [372-377]

INDICTMENTS found and returned in the Superior Court Department on May 3, 1999.

Pretrial motions to suppress evidence were heard by *Gerald F. O'Neill, Jr.,* J.

An application for an interlocutory appeal was allowed by *John M. Greaney,* J., in the Supreme Judicial Court for the county of Suffolk, and the appeal was reported by him to the Appeals Court.

*Julia K. Holler,* Assistant District Attorney, for the Commonwealth.

*Anne E. Gowen*, Committee for Public Counsel Services, for the defendant.

RAPOZA, J. On the morning of Sunday, January 24, 1999, the body of Pamela Bouchard was found floating in Nantucket Harbor. Treating her demise as a homicide, the police interviewed Thomas Dunham and the defendant, both acquaintances of the deceased. Following the interviews a warrant was obtained to search a dwelling at 38R Hooper Farm Road, Nantucket, for both drugs and physical evidence relating to Bouchard's death.

The defendant was later indicted for manslaughter, distribution of heroin, and the unlawful removal or conveyance of a human body.[1] He then filed several motions to suppress. One such motion, which ultimately proved to be successful, sought to suppress evidence seized at 38R Hooper Farm Road pursuant to the warrant. A second motion, which was denied by the motion judge, requested suppression of statements made by the defendant during an interview at the Nantucket police station. In this appeal we consider the Commonwealth's interlocutory appeal from the order allowing the defendant's motion to suppress evidence, as well as the defendant's appeal from the order denying the motion to suppress statements.[2]

1. *Motion to suppress evidence.* Turning first to the Commonwealth's appeal from the order allowing the motion to suppress evidence, we consider the relevant facts set out in the affidavit of State Trooper John E. Mawn, Jr., which accompanied the search warrant application.

(a) *Affidavit.* The affidavit's description of the events attending Bouchard's death and the disposal of her body derives primarily from statements made by Dunham to the police. On Friday, January 22, 1999, Bouchard was at Dunham's residence

---

[1]The theory of the Commonwealth's case is apparently that Bouchard died as a result of a drug overdose from heroin provided by the defendant. Following her death, the defendant and Dunham allegedly threw her body in the harbor from a ferry dock.

[2]The parties' respective applications for leave to appeal were allowed by a single justice of the Supreme Judicial Court and the two cases were transferred to this court for our determination. See Mass.R.Crim.P. 15(a)(2), 378 Mass. 882 (1979). Although docketed separately, the cases were heard by the same panel and we issue this opinion addressing both appeals.

located at 14 Union Street, Nantucket. Later that day, the defendant arrived with a "large quantity" of heroin[3] which the three individuals proceeded either to inject or ingest. The trio awoke the next morning, Saturday, and repeated the process, injecting or ingesting more heroin. That afternoon, Dunham and the defendant awoke to find Bouchard dead on the floor. They put her body under Dunham's bed, but only after the defendant had kicked and punched it several times.

At approximately midnight, Dunham and the defendant wrapped Bouchard's body in a blanket and put it in the cab of Dunham's pickup truck. The pair drove the body to a ferry dock and threw it into the water. They then returned to Dunham's apartment where the defendant told Dunham he was going home. Following the discovery of Bouchard's body on Sunday morning, the police located the defendant at 38R Hooper Farm Road and he agreed to go with them to the Nantucket police station. Dunham, who was also interviewed at the police station, told the police that the defendant was still attired in the same clothes that he had worn at the time of Bouchard's death.[4]

The affidavit then sets out information, based on Trooper Mawn's experience and training, with regard to the kinds of evidence that might be found at the scene of a crime of violence. Describing the significance of trace evidence at a crime scene, Mawn's affidavit relates how violent offenses involve a perpetrator coming "in contact with the physical surroundings in a forceful or otherwise detectable manner." It also states that, despite efforts to remove evidence of a crime, "traces may be left," citing numerous potential items to be found, including blood, hair, fibers, fingerprints, palm prints, footprints, and weapons. The affidavit concludes that "a crime scene will contain physical evidence which will aid in establishing the identity of the perpetrator(s) [and] the circumstances under which the crime was committed." The affidavit separately describes how "persons involved in the purchase, sale, and use

---

[3]The affidavit describes the amount as being "two or three bricks." The significance of that description, relative to the quantity and weight of the heroin involved, is not indicated.

[4]The basis for Dunham's assertion is not made clear in the affidavit. We infer that this information stems from an observation Dunham made when both he and the defendant were at the police station.

of heroin rely on certain means by which they carry, use, conceal, and administer heroin." It then recites a panoply of containers and instrumentalities used for the storage, preparation, and injection of heroin.

Based on the affidavit, a warrant issued in the early morning hours of Monday, January 25, 1999, authorizing the police to search 38R Hooper Farm Road, Nantucket, for "[d]rug evidence and [r]elated materials as defined in Chapter 94C of the MGL [and] [a]ny [t]race and/or [p]hysical [e]vidence, [p]hysiological [e]vidence related to the death of Pamela Bouchard." The warrant was executed at approximately 2:15 A.M. the same day and the property seized as a result of the search included twenty bags of heroin, a cigarette package with pills, two "crack" pipes, a test tube with white residue, two prescription bottles, a knife and sheath, two spiral bound notebooks, and assorted other drug-related items such as hypodermic needles, syringes, and glassine bags.

(b) *Discussion.* The affidavit, when read "in a commonsense and realistic fashion," *Commonwealth* v. *Donahue*, 430 Mass. 710, 712 (2000), quoting from *United States* v. *Ventresca*, 380 U.S. 102, 108 (1965), and without being subjected to "hypercritical analysis," *Commonwealth* v. *Blake*, 413 Mass. 823, 827 (1992), fails to establish probable cause for the search of 38R Hooper Farm Road either for drugs or for physical evidence relating to Bouchard's death.

"To establish probable cause to search, '[a]n affidavit must contain enough information for an issuing magistrate to determine that the items sought are related to the criminal activity under investigation, and that they reasonably may be expected to be located in the place to be searched at the time the search warrant issues.' " *Commonwealth* v. *Donahue*, 430 Mass. at 711-712, quoting from *Commonwealth* v. *Cinelli*, 389 Mass. 197, 213, cert. denied, 464 U.S. 860 (1983). "The affidavit need not convince the magistrate beyond a reasonable doubt, but must provide a substantial basis for concluding that evidence connected to the crime will be found on the specified premises." *Commonwealth* v. *Donahue*, 430 Mass. at 712. In determining whether probable cause exists, the magistrate is limited to a consideration of both the facts contained within the

four corners of the affidavit as well as those reasonable inferences that may be drawn from the sworn information. See *Commonwealth* v. *Smith*, 370 Mass. 335, 343, cert. denied, 429 U.S. 944 (1976); *Commonwealth* v. *Donahue*, 430 Mass. at 712.

The information contained in the affidavit does not support a conclusion that there was a nexus between 38R Hooper Farm Road and either illegal drugs or Bouchard's death.

(i) *Drugs*. Even if we were to treat the address set forth in the affidavit as the defendant's home,[5] "there was no specific information in the affidavit which tied the defendant's residence to illegal drug transactions, other than that he lived at those premises." *Commonwealth* v. *Olivares*, 30 Mass. App. 596, 600 (1991). See *Commonwealth* v. *Kaufman*, 381 Mass. 301, 304 (1980) ("Notably absent is reliable specific information from any quarter placing illegal drugs or drug transactions there in the past"). The fundamental flaw in the affidavit is that it does not explain why there was probable cause to believe that drugs would be found at 38R Hooper Farm Road other than it being the presumed residence of the defendant who, three days previously, had used heroin at another location. See *Commonwealth* v. *Olivares*, 30 Mass. App. Ct. at 600-601 (drug transaction at defendant's business premises did not supply probable cause to search the defendant's residence).

The affidavit contains no evidence establishing that the defendant had ever kept drugs at the address to be searched or that he had brought drugs onto the premises following Bouchard's death. Nor does the reference in the affidavit to the defendant injecting or ingesting heroin at Dunham's house approximately two days before the issuance of the warrant shore up the Commonwealth's case. "Information establishing that a person is guilty of a crime does not necessarily constitute probable cause to search the person's residence." *Commonwealth* v. *Cinelli*, 389 Mass. at 213. Moreover, although the affidavit

---

[5]We note that the connection between the defendant and 38R Hooper Farm Road, other than his presence there at the time of the initial visit by police, is not established in the affidavit. The defendant's parting statement to Dunham early Sunday morning that he was "going home," absent more, does not mean that the particular location where the police "later located" him was his residence. The defendant had no demonstrated connection with 38R Hooper Farm Road other than merely being present there at the time the police arrived.

states that the defendant had brought heroin to Dunham's house, it does not indicate that the drugs had previously been stored at 38R Hooper Farm Road. Nor does it state that, after two days of drug use by three persons, any of the heroin remained or that there was reason to believe the defendant was still in possession of drugs almost three days later.

The affidavit fails to recite facts that establish a substantial basis for concluding that the defendant was in possession of drugs or drug paraphernalia at 38R Hooper Farm Road. Absent such a basis, it cannot reasonably be said that there was probable cause to conduct a search for drugs at that location.

(ii) *Physical or trace evidence.*[6] The affidavit supplies no link between Bouchard's death at 14 Union Street and the likelihood of physical or trace evidence being found at 38R Hooper Farm Road. First, having suggested that Bouchard's death was caused by a drug overdose, the affidavit discusses the likelihood of discovering evidence of a violent crime. Second, the affidavit fails to explain how a crime committed at 14 Union Street would result in the discovery of physical evidence of that crime at 38R Hooper Farm Road.[7] Third, the affidavit does not provide any information concerning the circumstances of Bouchard's death from which it could be inferred that physical or trace evidence was carried away from the scene by the defendant and

---

[6]The return filed by the police following the execution of the search warrant does not indicate the seizure of any physical or trace evidence as described in both the affidavit and the warrant. Nonetheless, we address whether there was probable cause to search for such evidence at 38R Hooper Farm Road where the Commonwealth argues, in the alternative, that the seizure of drugs and drug paraphernalia was justified as an inadvertent discovery of contraband in plain view during the execution of a valid warrant. The parties do not argue as an issue in this case, and we do not decide, whether the seizure of drugs and related paraphernalia at 38R Hooper Farm Road was indeed inadvertent where the police had previously requested a warrant to search for such items at that address. We also note that the Supreme Judicial Court has not decided whether to retain the inadvertence requirement relative to plain view seizures following its rejection by the United States Supreme Court in *Horton* v. *California*, 496 U.S. 128, 130 (1990). See *Commonwealth* v. *D'Amour*, 428 Mass. 725, 731 & n.9 (1999).

[7]We note that the affidavit speaks exclusively in terms of evidence sought at the "crime scene." Although the search warrant was obtained for 38R Hooper Farm Road, the affidavit clearly indicates that the crime scene was Dunham's apartment, the location where Bouchard died.

deposited in some fashion at 38R Hooper Farm Road. Compare *Commonwealth* v. *Cinelli*, 389 Mass. at 213; *Commonwealth* v. *Wilson*, 427 Mass. 336, 343 (1998) (where murder victims were stabbed and shot to death in an extremely violent triple homicide, it was reasonable to infer that hair, fibers, blood, or weapons would be in the vehicle used by the defendant to travel away from the crime scene).

The facts contained in the affidavit, however sad and sordid, failed to provide a substantial basis for concluding that evidence connected with either Bouchard's death or illegal drugs would be found at 38R Hooper Farm Road. The motion to suppress items seized during the search pursuant to the warrant was properly allowed.

2. *Motion to. suppress statements.* We turn now to the defendant's appeal from the denial of his motion to suppress statements made to officers at the Nantucket police station. He argues that he was escorted to the police station after the officers had illegally entered the dwelling where he was present and seized him at gunpoint. Therefore, the defendant asserts, any subsequent statements made by him represent fruits of the unlawful entry and seizure and must be suppressed.

(a) *Background.* The following additional facts are relevant to the defendant's appeal and are drawn from the motion judge's memorandum and order on the motion to suppress statements and from the testimony of State Trooper John Kotfila.[8]

Following the discovery of Bouchard's body, but before the cause of her death was known, the police developed a list of her acquaintances, including the defendant,[9] Dunham, and Tony Correia and his girlfriend, Brynne Donahue. State Trooper Kotfila and Officer Chadwick of the Nantucket police visited 38R Hooper Farm Road where Correia and Donahue allegedly

---

[8]Kotfila was the sole witness at the hearing on the motion and his testimony was plainly credited by the motion judge. See *Commonwealth* v. *Kitchings*, 40 Mass. App. Ct. 591, 593 n.4 (1996) (where police officer was the only witness at the hearing on the motion to suppress, and the motion judge plainly credited his testimony, appellate court may adopt officer's testimony as to certain additional facts). See also *Commonwealth* v. *Wedderburn*, 36 Mass. App. Ct. 558, 562 (1989).

[9]In addition to being known as an aquaintance of the victim, the defendant had apparently been overheard the previous weekend making threats against her.

lived. The officers spoke with Correia at the entrance to the house, and he told them that he had heard about Bouchard's death. He also told the officers that he had last seen the defendant either Friday or Saturday night when the defendant had driven him and his girlfriend to several bars. Donahue similarly stated that she knew the defendant and that she had last seen him Saturday night.

Officer Chadwick then received a page instructing him to contact the Nantucket police department. In the resulting call he learned that someone had seen the defendant arrive at 38R Hooper Farm Road in a truck earlier that morning and that the truck was still parked at the side of the house.[10] When Kotfila heard this information, he asked whether the defendant was in the house; Correia admitted that he was in an upstairs bedroom.

The two officers entered the house with their guns drawn and without announcing their presence. They went upstairs and observed that the door to the left-hand bedroom was partly open. However, while Kotfila could see the television playing, he could not see if anyone was in the room. He further pushed open the door and found the defendant sitting on a couch, smoking a cigarette, and watching television. Kotfila identified himself as a State trooper and ordered the defendant to keep his hands where they could be seen. He asked the defendant if he was Peter Chongarlides and the defendant acknowledged that he was. The defendant was then told to extinguish his cigarette and the officers inquired if he had any weapons in his possession. He indicated he had a knife on his belt which was then secured by the police. At that point the police reholstered their weapons and pat-frisked the defendant, but no additional weapons were found.

Kotfila then informed the defendant that they wanted to ask him some questions regarding the death of Bouchard. Miranda rights were read to the defendant and he indicated that he understood them. Kotfila asked the defendant if he would go to the police station to give a statement about the death of the

---

[10]The officers had observed a truck at the side of the house ten minutes previously. A record check had revealed that the truck was registered to someone other than the defendant.

victim and the defendant responded that he would, stating, "I've got nothing to hide."

The defendant was escorted outside to the police cruiser where he was seated in the back and driven to the police station. There he was taken to an interview room where Kotfila read him his Miranda rights for a second time and the defendant signed a form waiving those rights. Kotfila then began questioning the defendant, first attempting to record the interview in longhand but, after almost thirty minutes, he switched to an audiotape recording. At the beginning of the recording, the defendant was asked to acknowledge that he had signed a waiver of his rights, and he did so. The defendant was questioned for approximately three hours and thereafter provided the police with a handwritten statement.[11]

During the first portion of the interview the defendant related a largely exculpatory account of his activities over the course of the preceding Friday and Saturday. He stated that he lived in New Bedford and had arrived on Nantucket Friday night, spending time with Correia and Donahue and dropping in on Dunham. He denied having seen Bouchard. After the defendant had made these statements, Kotfila suspended the questioning and left the room to listen to the interview of Dunham, who was also at the station. Officer Chadwick remained in the room with the defendant.

When Kotfila returned to the interview room where the defendant was waiting, Kotfila reported to the defendant some of the details of Dunham's statement, which placed the defendant with Bouchard at the time of her death and inculpated him in the disposal of her body. The defendant then acknowledged that, after going out with Correia and Donahue on Friday night, he had joined Dunham and Bouchard at Dunham's place. He stated that when he arrived there, Dunham and Bouchard

---

[11]Although the defendant indicated that he had spent a large portion of the days preceding his arrival at the police station both drinking and using heroin, Kotfila testified at the hearing on the motion to suppress that he did not perceive the defendant to be under the influence of alcohol or drugs during the time that he was with him. The motion judge apparently credited that testimony, finding that "[t]here was no alcohol on the defendant's breath and he appeared normal in all respects."

were already "high" and that he also took some heroin and passed out. He denied supplying them with any drugs.

The defendant stated that when he woke up on Saturday morning, Bouchard was dead. He said that he and Dunham performed CPR on her for approximately an hour in an effort to revive her. The defendant said that he then left the apartment because he was emotionally unable to remain there following Bouchard's death, and he denied having any role in disposing of the body. The defendant made a written statement alleging the facts as he had described them to Kotfila the second time.

(b) *Discussion.* The motion judge, who assumed for purposes of the motion to suppress that the police entry into 38R Hooper Farm Road was illegal, concluded that "there was nothing that flowed from that entry which requires suppression." Operating from that same assumption, we conclude that, in the circumstances of this case, the "improper conduct unrelated to the statements does not compel suppression of the statements." *Commonwealth* v. *Shipps*, 399 Mass. 820, 829 (1987). "Where the defendant seeks to suppress information obtained after unlawful police conduct, the issue is whether the evidence challenged has been obtained by exploiting the illegality or by means sufficiently distinguishable to dissipate the taint." *Commonwealth* v. *Manning*, 44 Mass. App. Ct. 695, 698 (1998), quoting from *Commonwealth* v. *Fredette*, 396 Mass. 455, 458-459 (1985). "[T]he question whether a confession is the product of free will must be resolved by looking at several factors including (1) Miranda warnings, (2) the temporal proximity of the [illegal conduct] and the confession, (3) the presence of intervening circumstances, and (4) the purpose and flagrancy of the official misconduct." *Commonwealth* v. *Bradshaw*, 385 Mass. 244, 258 (1982). See *Brown* v. *Illinois*, 422 U.S. 590, 602 (1975).

The defendant expressed a willingness to accompany the police to the station and consented to speak with them. There was no indication that he was under the influence of either drugs or alcohol at the time or that he did not understand the significance of the warnings. The defendant began speaking with officers at the police station sometime around 3:30 P.M. Although there is no evidence in the record as to the time the

officers entered the house at 38R Hooper Farm Road and read the defendant his Miranda rights, it appears that those events occurred shortly before the defendant's arrival at the Nantucket police station. At the beginning of the interview, the defendant was read his Miranda rights for the second time, and he signed a written waiver of those rights. Approximately one-half hour later, the defendant was reminded that he had signed the waiver and he acknowledged that fact on audiotape.

For the next couple of hours the defendant denied any involvement with the victim and gave exculpatory answers to all questions put to him. It was not until after 5:40 P.M., more than two hours after the interview had begun, that his story changed and he admitted to having seen the victim on the night before she died. This constitutes a sufficient time interval to insulate the inculpatory statements ultimately made by the defendant from the taint of any illegality involving the police entry at 38R Hooper Farm Road. See *Commonwealth* v. *Fielding*, 371 Mass. 97, 114 (1976) (motion to suppress denied where three hours passed between illegal arrest and confession); *Commonwealth* v. *Sylvia*, 380 Mass. 180, 184 (1980) (motion to suppress denied where one and one-half hours passed between illegal arrest and confession); *Commonwealth* v. *Bradshaw*, 385 Mass. at 258 (where the defendant was illegally arrested around 1 P.M., the tape-recorded interrogation began at 2:50 P.M., and Miranda warnings given on two occasions, his confession was not a fruit of the illegal arrest).

In *Bradshaw*, the court held that the defendant's confession was the product of intervening circumstances, and not the illegal arrest, when it took place after the defendant was told that a witness had made statements implicating him in the murder. 385 Mass. at 259. Similarly, here the change in the defendant's story occurred after he was informed by Kotfila of the statements made by Dunham, which placed the defendant with the victim both during the hours prior to her death and after she had died. Contrast *Commonwealth* v. *Manning*, 44 Mass. App. Ct. at 699 (motion to suppress denied where no intervening circumstances between illegal arrest and taking of defendant's photograph).

The police officers who entered the residence located at 38R

Hooper Farm Road were not engaged in purposeful and flagrant misconduct. The officers were justified in being wary at the time when they entered the house because they had first been told that the defendant was not there and then later informed that he was actually upstairs. It could be inferred from the changing story as to his whereabouts that he was hiding from, and avoiding contact with, the police. Once they thought that both the area and the defendant had been secured, and they no longer feared for their own safety, the officers made no attempt to either "exploit the circumstances" or to take advantage of the defendant as a result of their entry into the house. See *Commonwealth* v. *Shipps*, 399 Mass. at 829-830. Moreover, no effort was made deliberately to frighten or intimidate the defendant into making a confession. See *ibid*. "In these circumstances, outlawing the defendant's statements would hardly have served an important demonstrative purpose of deterring the police from future malfeasance." *Id*. at 830.

The motion to suppress the defendant's statements was properly denied.

> *Order allowing motion to suppress evidence affirmed.*
>
> *Order denying motion to suppress statements affirmed.*