## Commonwealth vs. Michael Harmon.

No. 03-P-1339.

Middlesex. October 28, 2004. - May 6, 2005.

Present: Armstrong, C.J., Dreben, Perretta, Laurence, & Katzmann, JJ.

*Constitutional Law,* Search and seizure. *Search and Seizure,* Probable cause, Affidavit. *Probable Cause. Practice, Criminal,* Instructions to jury. *Evidence,* Inference.

This court concluded that an affidavit to search an apartment contained sufficient information to establish probable cause to believe that the items sought would be found in the place described therein (an apartment where the defendant was seen three and one-half hours after the commission of the crime in question), where considering the gravity of the crime charged (murder) and the highly inculpatory nature of the evidence to be concealed (a revolver, ammunition, and clothing), it was reasonable to believe that the defendant would seek to hide or dispose of the items soon after the crime and that the defendant would be likely to hide the items in that apartment, the residence of a man who provided both a means of leaving the area in which the murder occurred and access to tools of disguise. [459-463]

At a criminal trial, the judge's instructions to the jury on consciousness of guilt were correct and did not contain any improper suggestion as to what the jury should or should not infer from the evidence presented. [463-466]

INDICTMENT found and returned in the Superior Court Department on March 1, 2001.

The case was tried before *Paul A. Chernoff,* J.

*David M. Skeels,* Committee for Public Counsel Services, for the defendant.

*Loretta M. Smith,* Assistant District Attorney, for the Commonwealth.

KATZMANN, J. The defendant was convicted of being an accessory after the fact to murder.[1] The case arose out of the events

---

[1] He was acquitted of the other charge against him, illegal possession of a firearm.

surrounding the fatal shooting of Joseph Alemesis (victim) on February 2, 2001, in Lowell. Charles Byrd pleaded guilty to murdering the victim. The defendant, on appeal, challenges the sufficiency of an affidavit for a search warrant that turned up incriminating evidence, and the trial judge's instructions to the jury on consciousness of guilt. We affirm the judgment.

1. *Sufficiency of the affidavit.* a. *Facts.* The defendant argues that the affidavit for the search warrant failed to establish probable cause to believe that the items sought would be found in the apartment. The warrant, issued around 1:00 A.M. on February 3, 2001, listed, inter alia, a shirt, a pair of gloves, and a pair of blue jeans worn by the shooter, the gun used, and any physical evidence, such as blood or hair that might be connected to the shooting.[2]

Sergeant Thomas Sullivan of the Massachusetts State police, an experienced homicide investigator, submitted the affidavit that supported the application for a warrant to search apartment 2 at 99 Jewett Street in Lowell, occupied by Ernesto Diaz.[3] Based on information provided by other police officers, Sullivan described the investigation of the murder of the victim, and why there was probable cause that evidence of the murder would be found in apartment 2. As set forth in the affidavit, on February 2, 2001, at approximately 2:10 P.M., Lowell police responded to a 911 call at 239 Lakeview Avenue, a multifamily building in Lowell, where they found the victim, who had suffered a fatal gunshot wound to his head, lying in a pool of blood. The police learned from the victim's niece that the victim had lived in an apartment at that address, and that just before he was shot, he had been in his niece's second-floor apartment with a man subsequently identified by witnesses as Charles Byrd. Byrd was wearing jeans, a light-colored orange short-sleeved shirt, and black leather ski-type gloves. "Right after [Byrd and the victim]

---

[2] In relevant part, the warrant sought "a silver revolver, a pair of jeans, a light colored or orange short sleeved shirt, black leather ski type gloves, ammunition, blood, physiological fluids and s[e]cretions, hair, fibers, and items containing traces of the above mentioned articles . . . ."

[3] The defendant and the Commonwealth agreed that the defendant had "standing" or an "expectation of privacy" to challenge the search warrant in that the defendant's personal papers were seized from the bedroom of apartment 2.

left [his niece's] apartment," his niece and her boyfriend "heard a 'BOOM' followed by the beeping of the smoke detector." The victim's niece and her boyfriend rushed to the door of the apartment, opened it, and saw the victim lying in the hall "with blood all around him. His face and head were blown apart." The victim's brother, James, who also lived at 239 Lakeview Avenue, was inside his own apartment when he heard the gunshot, and immediately looked outside and saw three people running from the building. He recognized Byrd, another man he knew as "Tigger," and a third man whose face he could not see.

According to Sergeant Sullivan's affidavit, James said that his brother (the victim) was addicted to heroin, and that in the previous week, Tigger and a woman named Renee or Rachel had come to 239 Lakeview Avenue, and told James that they were looking for the victim, who they said had stolen $300 worth of heroin from them. They said that they were anxious to "get their hands" on the victim. When Nuon Tep (also known as "Tigger") was interviewed by the police, he told them that he, Renee Daley, and Byrd had given the victim $300 to buy some heroin for subsequent resale, but that the victim had given them less than the expected amount of heroin. On February 2, at around 1:00 P.M., Tep said that Byrd and "Mike" (whom he would later identify from a photo array as the defendant) arrived at his house. The defendant was wearing leather gloves, and he showed Tep and Byrd a silver revolver which he pulled from his pants. They discussed going to the victim's house "to scare him." Byrd said, "Let's go beat the shit out of [the victim]."

As described by Sergeant Sullivan, Tep, Daley, Byrd, and the defendant then proceeded to the victim's apartment building. Once there, Tep, the defendant, and Byrd went to the victim's door. At this point, Byrd had the gun in his pants. Tep heard a gunshot and the three men ran to a car in which Daley was sitting. Once inside the car, Byrd said, "That's what happens when people fuck with me." Daley then dropped Byrd and the defendant "off on Jewett Street in Lowell near an apartment building in the vicinity of the public works department."

Police officers set up surveillance in the area around 99 Jew-

ett Street, a multi-unit apartment building. As a result of the surveillance, Ernesto Diaz, who lived in apartment 2 at 99 Jewett Street, was taken into custody on an unrelated matter. Diaz told the police that the defendant and Byrd had been inside his apartment earlier that evening, arriving between 5:30 and 6:30 P.M., and that they asked for a ride. Diaz arranged for his cousin, Danny Rivera, to drive the defendant and Byrd from his apartment at 99 Jewett Street to the Burlington Mall, in a car registered to Diaz's girlfriend.

Rivera, in turn, told the police that at around 6:00 P.M., he drove the defendant and Byrd to the Burlington Mall. At the mall, the defendant bought some hair dye, a package of hair combs, and a brush from a CVS pharmacy (CVS). From Burlington, Rivera drove the defendant and Byrd back to Lowell, where the two men left the car, leaving behind the CVS bag with the merchandise and the receipts.

Based on his training and experience, Sergeant Sullivan noted that persons participating in the commission of a violent crime are "often in contact with the physical surroundings in a forceful or otherwise detectable manner. When they do so, those persons often transfer evidence to surfaces that they come in contact with at other locations." He stated that attempts are often made to alter, destroy, and cover up evidence following the commission of violent crimes. However, "traces may be left in the form of blood, physiological fluids and secretions, hair, fibers, [and] gunshot residue."

Based on the foregoing information contained in Sergeant Sullivan's affidavit, the search warrant for apartment 2 at 99 Jewett Street was issued and executed on February 3. Among the items found by the police were a white plastic bag containing a pair of tan trousers and a Hawaiian shirt; a pair of gloves; various documents addressed to the defendant or containing the defendant's name; and the gun identified as the murder weapon.

b. *Discussion.* The Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights require that warrants issue only upon probable cause. Probable cause to believe a person is guilty of a given crime does not, without more, create probable cause to search. *Commonwealth* v. *Jean-Charles*, 398 Mass. 752, 757 (1986). In

determining whether there was probable cause for a search warrant to issue, the reviewing court does not examine the facts subsequently revealed; instead "our inquiry as to the sufficiency of the search warrant application always begins and ends with the 'four corners of the affidavit.' " *Commonwealth* v. *O'Day*, 440 Mass. 296, 297 (2003), quoting from *Commonwealth* v. *Villella*, 39 Mass. App. Ct. 426, 428 (1995). *Commonwealth* v. *Hardy*, *ante* 210, 211 (2005). To give rise to probable cause, an affidavit must contain information allowing the issuing magistrate to determine that the items sought are related to the crime being investigated, and that these items "reasonably may be expected to be located in the place to be searched." *Commonwealth* v. *Cinelli*, 389 Mass. 197, 213, cert. denied, 464 U.S. 860 (1983). See *Commonwealth* v. *Kaufman*, 381 Mass. 301, 304 (1980). We give considerable deference to the magistrate's determination, *Commonwealth* v. *Walker*, 438 Mass. 246, 249 (2002), and even "the resolution of doubtful or marginal cases . . . should be largely determined by the preference to be accorded to warrants." *Commonwealth* v. *Germain*, 396 Mass. 413, 418 (1985), quoting from *United States* v. *Ventresca*, 380 U.S. 102, 108-109 (1965). See *Commonwealth* v. *Querubin*, 60 Mass. App. Ct. 695, 698 (2004). Search warrant affidavits should be interpreted "in a commonsense and realistic fashion," *Commonwealth* v. *Donahue*, 430 Mass. 710, 712 (2000), quoting from *United States* v. *Ventresca*, *supra* at 108, and "read as a whole, not parsed, severed, and subjected to hypercritical analysis." *Commonwealth* v. *Donahue*, *supra*, quoting from *Commonwealth* v. *Blake*, 413 Mass. 823, 827 (1992). "All reasonable inferences which may be drawn from the information in the affidavit may also be considered as to whether probable cause has been established." *Commonwealth* v. *Donahue*, *supra*.

The defendant argues that the affidavit fails to meet the second part of the probable cause test, in that it does not establish that the items identified would probably be found in the apartment at 99 Jewett Street. More specifically, he argues that there was no first-hand observation of items being brought to the apartment, and that during the three and one-half hours between the commission of the crime and the sighting of the

defendant and Byrd (the murderer) in the apartment, the evidence could have been discarded. In contrast to other cases where suspects go to their own homes or the home of a family member or trusted person after the commission of a crime, see, e.g., *Commonwealth* v. *Wilson*, 427 Mass. 336, 344 (1998) (mother's house); *Commonwealth* v. *Farrell*, 14 Mass. App. Ct. 1017, 1017-1018 (1982) (girlfriend's house), the affidavit does not (so the defendant claims) establish a link between Diaz, who occupied the apartment, and those involved in the crime.

The defendant misapprehends the notion of "probable" cause. "[T]he nexus between the items to be seized and the place to be searched *need not be based on direct observation*" (emphasis added). *Commonwealth* v. *Donahue*, 430 Mass. at 712, quoting from *Commonwealth* v. *Cinelli*, 389 Mass. at 213. Moreover, to pass muster, an application need not establish to a certainty that the items to be seized will be found in the specified location, nor exclude any and all possibility that the items might be found elsewhere. The test is *probable* cause, not certainty. "The affidavit need not convince the magistrate beyond a reasonable doubt, but must provide a substantial basis for concluding that evidence connected to the crime will be found on the specified premises." *Commonwealth* v. *Donahue, supra.* In the absence of direct observation, we look to four factors from which a nexus between place and items may be determined: (1) the type of crime, (2) the nature of the items sought, (3) the extent of the suspect's opportunity to conceal the items at the location to be searched, and (4) reasonable inferences as to where a criminal would likely hide items of the sort sought. *Commonwealth* v. *O'Day*, 440 Mass. at 302. *Commonwealth* v. *Donohue, supra.*

The affidavit sets forth sufficient facts connecting the defendant and Byrd to apartment 2 at 99 Jewett Street, and to establish probable cause that evidence relating to the murder would be found there.[4]

The items listed in the search warrant — the silver revolver

---

[4] The defendant contends that the affidavit was deficient in that it failed to establish Diaz's reliability. Contrary to the defendant's characterization, Diaz was not an "informant." "[P]ersons who supply information only after being interviewed by police officers, or who give information as witnesses during the course of an investigation, are not informers." *Commonwealth* v. *Martin*, 6 Mass. App. Ct. 624, 628 (1978), quoting from *United States* v. *Oliver*, 570

(which a witness said was used in the murder), a pair of jeans, a light-colored or orange short-sleeved shirt, black leather ski-type gloves (clothing which a witness said Byrd was wearing), and ammunition (an instrumentality of a crime involving a gunshot) — were all reasonably related to the investigation and constitute evidence of the criminal activity. Considering the gravity of the crime and the highly inculpatory nature of the evidence to be concealed, it is reasonable to believe that the defendant and Byrd would seek to hide or dispose of the items soon after the crime; the approximately three and one-half hours that elapsed between the crime and their arrival in the apartment is of such limited duration as to support a temporal nexus.

In assessing whether there was probable cause to believe that evidence would be disposed of in the first known place to which the defendant and Byrd went following the crime, we note the relationship between the occupant of the premises (Diaz) and the defendant and Byrd. The defendant and Byrd went to Diaz, demonstrated their trust in him by asking for a ride and accepting a ride arranged by him with his cousin, Danny Rivera. Rivera drove the defendant and Byrd (in a car registered to Diaz's girlfriend) to a mall where they purchased tools of disguise (hair dye, combs and a brush), and then drove the defendant and Byrd back to Lowell. In these circumstances it is reasonable to conclude that the defendant and Byrd would be likely to hide evidence in the apartment of Diaz, a man who provided both a means of leaving the area and access to hair dye.[5] Our conclusion that there was probable cause to search the apart-

F.2d 397, 401 (1st Cir. 1978). In such case, "[p]ersonal observation is a sufficient basis upon which to predicate a finding of reliability and support a finding of probable cause." *Commonwealth* v. *Martin, supra.* Diaz was a named and identified person, and his name, date of birth, and address are set forth in the affidavit. He provided information concerning the whereabouts of the defendant and Byrd, but did not implicate them in a crime.

[5]Probable cause to search the apartment was buttressed by the portions of the affidavit seeking forensic evidence (hair, blood, fibers, etc.), setting forth the violent nature of the crime, and the nature of trace evidence. When the victim's niece and her boyfriend rushed to the door of her apartment at 293 Lakeview Avenue, they saw that the victim's face and head were "blown apart"; there was blood all around the victim. See *Commonwealth* v. *Chongarlides*, 52 Mass. App. Ct. 366, 372 (2001), summarizing *Commonwealth* v. *Wilson*, 427 Mass. 336, 342-343 (1998) ("where murder victims were stabbed and shot to death in an extremely violent triple homicide, it was reasonable to

ment is not based on a purely temporal test but rather on the affidavit taken as a whole, with all of its particular facts. See *Commonwealth* v. *Matias*, 440 Mass. 787, 794 (2004), citing *Commonwealth* v. *Atchue*, 393 Mass. 343, 346-349 (1984).[6]

2. *Jury instruction.* At trial, the prosecution adduced evidence in addition to that which was set forth in the search warrant affidavit. There was evidence that the defendant lived in apartment 2 at 99 Jewett Street; that after the shooting, at his request, he was driven to 99 Jewett Street; and that he told Byrd to come with him. On February 8, six days after the shooting, and after the defendant had purchased the hair dye from CVS, he was located in New York City and arrested. He told police that he was with Byrd, Tep, and Daley before the shooting, when they discussed the failed drug deal involving the victim. The defendant also said that Byrd wanted to beat up the victim. He denied having, seeing, or disposing of a firearm on February 2.

The defendant argues on appeal that the trial judge committed reversible error in his charge to the jury, improperly endorsing a factual conclusion for which the Commonwealth failed to adduce adequate evidence. The relevant portion of the jury instructions is as follows:

---

infer that hair, fibers, blood, or weapons would be in the vehicle used by the defendant to travel away from the crime scene"). This is not a case like *Chongarlides*, upon which the defendant relies, where trace evidence was sought but there was no violent crime, or "information concerning the circumstances of [the victim's] death from which it could be inferred that physical or trace evidence was carried away from the scene by the defendant and deposited in some fashion" at the defendant's home. 52 Mass. App. Ct. at 371-372.

[6]The cases cited by the defendant are distinguishable. He cites *Commonwealth* v. *Jean-Charles*, 398 Mass. at 757, for the proposition that strong reason to suspect that items sought will be in the place to be searched is not adequate. But in that case, the evidence sought was a doctor's appointment book, and the affidavit failed to establish that the appointment book, if found, would have any relation to the crime being investigated. *Id.* at 758-759. By comparison, the items sought in the case at bar (a gun, clothing worn by the shooter, and blood, hair, and fibers from the crime scene) were clearly connected to the crime. Similarly, *Commonwealth* v. *Chongarlides*, 52 Mass. App. Ct. 366, is inapposite. There, this court rejected a warrant to search a defendant's home for drugs based solely on the fact that the defendant had used drugs three days earlier in a different location. *Id.* at 370. The connection, both logical and temporal, between the crime and place to be searched is much stronger in the instant case.

"And we've also heard evidence in this case, and it's for you to determine whether — what it suggests or not. But, if you heard evidence in this case which suggests that the defendant fled the Commonwealth, or his evidence [*sic*], or otherwise engaged in conduct inconsistent with innocence, then, you may consider whether or not there was a — what we call a consciousness of guilt under the law.

"If the Commonwealth does establish that the defendant did conceal, or did dispose of certain evidence, or fled the Commonwealth, you may consider whether such flight, or such concealment, or disposing of evidence, indicate[s] feelings of guilt by the defendant, and whether, in turn, such feelings of guilt might tend to show actual guilt of the charges against him.

"You are not required to draw such inferences, and you should not do so, unless they appear to be reasonable in light of all the circumstances in this case.

"If you decide that such inferences are reasonable, it will be up to you to decide how much importance to give them. But you should consider that there might be other reasons why an innocent person might flee, or conceal, or dispose of evidence."

In essence, the defendant contends that the judge, by suggesting that the jury *could* find that the defendant had concealed or disposed of evidence, gave his imprimatur to a finding that the jury could not have made as matter of law.

Where, as here, an objection to jury instructions is timely made, "we review to determine if there were error and, if so, whether it was reversible error." *Commonwealth* v. *Simpson*, 434 Mass. 570, 587 (2001). It is improper for a judge to direct the jury as to what inferences they should draw from the facts. *Commonwealth* v. *Cote*, 5 Mass. App. Ct. 365, 369 (1977). In this case, there was no error.

The defendant's argument rests on the proposition that the Commonwealth produced no evidence tending to show "that the defendant did conceal, or did dispose of certain evidence." In fact, the record is replete with testimony tending to show that

the defendant did just that. Testimony established that the defendant purchased hair dye; a person's dyeing his hair or otherwise changing his appearance can constitute the concealing of evidence. See *Commonwealth* v. *Carrion*, 407 Mass. 263, 277 (1990). Cf. *Commonwealth* v. *Johnson*, 46 Mass. App. Ct. 398, 406 (1999). Testimony also revealed that a shirt worn by Byrd was discovered in an apartment where the defendant was staying (apartment 2 at 99 Jewett Street) and to which the defendant took Byrd, that gloves worn by the defendant at the scene of the crime were discovered on a futon in that apartment, and that the weapon used in the shooting was discovered in a common hallway of the building to which the defendant took Byrd.

The defendant makes much of the fact that there was no evidence that the defendant *actually helped Byrd* to hide these items. A jury may rely not only on the evidence but on reasonable inferences drawn from the evidence. See, e.g., *Commonwealth* v. *Dinkins*, 415 Mass. 715, 725 (1993). The Commonwealth's evidence in this case was ample to support an inference that the defendant assisted in concealing evidence: he invited Byrd, the person in possession of that evidence, to the location where the evidence was ultimately discovered.

Nor did the judge's instruction contain words tending to endorse as true any inference. The judge qualified his references to the evidence with conditional language four times: "If you heard evidence in this case which suggests . . ."; "If the Commonwealth does establish . . ."; "You are not required to draw such inferences, and you should not do so, unless . . ."; "If you decide that such inferences are reasonable. . . ." Additionally, the judge gave the standard consciousness of guilt instruction, reminding the jury that there might be innocent reasons for flight or concealing evidence.

We do not focus on the challenged language alone, but instead examine it in the context of the entire jury instruction. See *Commonwealth* v. *Grant*, 418 Mass. 76, 85 (1994); *Commonwealth* v. *Rodriguez*, 437 Mass. 554, 559 (2002). Here, the judge gave a proper explanation of consciousness of guilt, without any improper suggestion as to what the jury should or should not infer from the evidence presented. There was no error.

The defendant's reliance on *Commonwealth* v. *Haraldstad,* 16 Mass. App. Ct. 565, 570 (1983), is misplaced. In that case, the judge instructed the jury that they could infer facts that were plainly contradicted by the evidence. Here, the judge instructed the jury that they could find facts which, while not explicitly attested to by the evidence, were well within the realm of reasonable inferences arising from the evidence. Moreover, the defendant conceded that a consciousness of guilt instruction based on the defendant's flight was entirely appropriate.[7]

*Judgment affirmed.*

---

[7]That the jury were discriminating in their assessment of the evidence was demonstrated when they found the defendant not guilty of unlawful possession of a firearm, which the Commonwealth argued that the defendant had concealed outside his apartment. Hence, any finding of consciousness of guilt was not based on the defendant's having concealed the gun.