COMMONWEALTH vs. JOSE F. AVELLAR
(and fourteen companion cases[1]).

No. 06-P-644.

Bristol. November 8, 2006. - October 31, 2007.

Present: PERRETTA, COWIN, & MILLS, JJ.

*Search and Seizure,* Automobile, Reasonable suspicion, Probable cause, Exigent
   circumstances. *Constitutional Law,* Search and seizure, Reasonable
   suspicion, Probable cause, Waiver of constitutional rights, Admissions and
   confessions. *Probable Cause. Practice, Criminal,* Admissions and
   confessions.

A Superior Court judge erred in allowing the criminal defendants' motions to
   suppress both physical evidence seized as the result of a motor vehicle
   stop as well as inculpatory statements made by one defendant in the result-
   ing search of his apartment, where the police officers had a reasonable
   suspicion that a traffic violation had occurred and, therefore, the right to
   stop the vehicle [613]; where, regardless of any illegality in the officers'
   initial warrantless and nonconsensual entry and search of the apartment,
   the subsequent application for a search warrant was quite sufficient to
   establish probable cause in support of the issuance of the warrant [613-615];
   and where the evidence demonstrated both that the codefendant who made
   the statements knowingly and intelligently waived his right to remain silent
   and that the statements were not the product of any police misconduct
   requiring suppression [615-617].

INDICTMENTS found and returned in the Superior Court Depart-
ment on October 17, 2003.

Pretrial motions to suppress evidence were heard by *Gary A.
Nickerson,* J.

An application for leave to prosecute an interlocutory appeal
was allowed by *John M. Greaney,* J., in the Supreme Judicial
Court for the county of Suffolk, and the appeal was reported by
him to the Appeals Court.

---

[1]Four of the companion cases are against Avellar, five are against David
Medeiros, and five are against David J. Vieira. Avellar and Medeiros joined in
the brief submitted by Vieira.

*Tara L. Blackman,* Assistant District Attorney, for the Commonwealth.

*Stephanie M. Glennon* for the defendants.

PERRETTA, J. This matter is before us on the Commonwealth's interlocutory appeal, allowed by a single justice of the Supreme Judicial Court pursuant to Mass.R.Crim.P. 15(b), as appearing in 422 Mass. 1501 (1996), after a Superior Court judge allowed the motions of the defendants, Jose F. Avellar, David Medeiros, and David J. Vieira, to suppress physical evidence and the inculpatory statements of Vieira. The seizure of the physical evidence was predicated upon the stop of a motor vehicle, which led the police to search Vieira's apartment, where he then made inculpatory statements. While accepting the judge's detailed and comprehensive findings of fact, we find error in his conclusions of law leading to suppression of the evidence seized from the motor vehicle and Vieira's apartment. See *Commonwealth* v. *Jimenez,* 438 Mass. 213, 218 (2002); *Commonwealth* v. *Vesna San,* 63 Mass. App. Ct. 189, 190 (2005).

1. *Procedural background.* After their indictments in Superior Court, the defendants sought to suppress all physical evidence of drugs, drug dealing, and drug manufacturing seized after the stop of a motor vehicle driven by Avellar, occupied by Medeiros, and owned by Vieira. The three defendants also sought to suppress Vieira's inculpatory statements made during the search of his apartment.[2] However, the three defendants did not move for severance. See *Bruton* v. *United States,* 391 U.S. 123 (1968).

2. *The facts as found.* On August 6, 2003, at about 11:30 A.M., New Bedford police Detective Dennis Ledo received a telephone tip from a confidential informant known to him, who reported that two men, driving a black Toyota automobile bearing a specific registration number, had purchased a large quantity of inositol at a health-food store located in the Kempton Street area of New Bedford. Ledo then ascertained that the registered owner of the car was Vieira, who resided in apartment C at 79 Oesting Street and who was known to Ledo.

Based on that information, Ledo and State Trooper Michael

---

[2]Avellar and Medeiros do not argue that the statements they made at the time of the stop of the automobile should be suppressed.

Smith began surveillance of 79 Oesting Street and positioned themselves outside the rear of that building.[3] From that vantage point they were able to see two men, later identified as Avellar and Medeiros, get into the black Toyota. The officers followed the car to a pizza parlor and back to 79 Oesting Street, where they saw the two men return to the front of that address.

Continuing their surveillance, the officers next saw a trash truck enter the parking lot, tip a dumpster, empty its contents, and drive away. About forty-five minutes later, the officers saw Avellar and Medeiros again walking toward the black Toyota. They also saw that before the men got into the car, Avellar put two large garbage bags into the dumpster and one smaller bag in the trunk of the Toyota. The officers then followed the Toyota as it drove away from 79 Oesting Street, and they stopped the vehicle when they observed the driver violate G. L. c. 90, § 14B.[4]

Upon approaching the Toyota, Smith smelled marijuana and saw, in plain view on the console area of the vehicle's interior, a clear plastic bag containing what he believed, based upon his training and experience, to be marijuana. The occupants of the vehicle, Avellar and Medeiros, were ordered from the car. Controlled substances were found on each. They were arrested, advised of their Miranda rights, and placed in separate police cruisers. Although Avellar remained silent, Medeiros chose to speak. In response to questioning, he told the police that Vieira resided in apartment C at 79 Oesting Street; that he, Medeiros, did not have keys to that apartment; and that, in any event, no one was there.

The judge concluded that the stop of the Toyota was a pretext and suppressed all of the evidence therein found. However, the judge made additional findings in the event that this conclusion was error. The judge found that, if the stop of the vehicle were legal, the search of the car and arrest of Avellar and Medeiros would have been justified.

---

[3]Ledo and Smith were assigned to a "joint agency drug investigation unit."

[4]That statute provides in pertinent part that "[e]very person operating a motor vehicle, before . . . making any turning movement which would affect the operation of any other vehicle shall give a plainly visible signal by activating . . . directional lights or signal . . . by means of the hand and arm . . . ." G. L. c. 90, § 14B.

After the arrest of Avellar and Medeiros, Ledo and Smith returned to 79 Oesting Street and looked into the dumpster in which they had previously observed Avellar put two trash bags. There were only two trash bags in the dumpster, and the officers retrieved them. It was then about 3:45 P.M. The judge determined that because there was no evidence to show the size of the dumpster or whether it was locked or used exclusively by the residents of apartment C, the defendants had failed to sustain their burden of showing that Vieira had any expectation of privacy in the discarded bags.[5]

After removing the bags from the dumpster, the officers drove to a parking lot located in the same section of the city as Vieira's apartment. There they opened the bags and examined the contents. They found a receipt dated August 6 for a gallon of acetone, a substance which one of the officers knew to be used in rerocking cocaine; numerous empty containers of inositol powder; clear plastic bags with the corners torn off that would indicate the packaging of drugs for retail sales; larger plastic bags containing a residue that was field tested and found to be marijuana; and other plastic bags having an odor of acetone and containing a white residue which field tested positive for cocaine. Field testing of the drugs was completed by 4:00 P.M., at which time the officers requested assistance. The assembled group of about ten or more officers then proceeded back to Oesting Street without first obtaining a search warrant.

Arriving at 79 Oesting Street at about 4:30 P.M., the officers walked through an unlocked front door. They next came to a locked security door where they detected a strong odor of acetone, from which Ledo inferred that cocaine was being rerocked within the building. Attempting to gain entry through the security door, he pressed the buzzers for apartments A, B, and D. When the officers received no response, they broke the latch on the security door and entered a common hallway. Seeing that apartments A and B were on the first floor, they proceeded to the second floor, where apartments C and D were situated on opposite sides at the top of the stairs. There was a strong odor of acetone at the door to apartment C, and according to Ledo and Smith, the officers could hear voices, later determined to be

---

[5]The defendants, commendably, do not dispute the judge's conclusion as to the seizure of the trash bags from the dumpster.

coming from a television, and movement within the unit. The judge found that the "only noises emanating through the door" amounted to "someone walking within the apartment" rather than a "commotion."

Ledo knocked on the door of the unit twice and, receiving no response, kicked open the door. Upon entering the apartment, the officers saw Vieira was in the living and dining room area of the apartment. There was a quantity of cash on a coffee table in the living room area. The officers handcuffed and placed Vieira on a couch. Ledo gave Vieira his Miranda warnings, and Vieira stated that he did not wish to speak with the officers. The officers fanned out and made a "protective sweep" to determine whether anyone else was in the apartment.

In searching for other occupants of the apartment, Ledo passed through the kitchen, where he looked in the oven door of a range top stove and saw cocaine being cooked.[6] The judge did not credit Ledo's testimony that his observation of the contents of the oven was accidental or "mere happenstance." Rather, he found that "as Ledo fanned out through the apartment with the other officers, they were in effect looking for something more than human bodies. They were looking for contraband."

When Ledo announced his intention to seek a search warrant for the apartment, one officer was assigned to watch over Vieira as he sat handcuffed on the couch while another was assigned to stand at the doorway to the apartment. It was about 6:55 P.M. when Ledo returned to the apartment with a search warrant for both the car and the apartment. At that time, Smith again advised Vieira of his Miranda rights, which Vieira stated that he understood.

Notwithstanding Vieira's earlier statement that he did not wish to speak with the police, Smith asked Vieira a general question along the lines of whether he wanted to say anything about the events of the day. Vieira responded that he wanted to cooperate. He then told the police where contraband could be found in the apartment and that he had obtained the cocaine from an individual who worked at a pizza parlor. Later that evening the black Toyota was taken to a police facility and searched. Controlled substances were found in the trunk.

---

[6]Ledo testified only that the oven door had a clear glass panel and that he could see the contents through the door because the oven light was on.

Based upon the facts as found by the judge, we take up the Commonwealth's claims that the judge erred in concluding that the stop of the black Toyota was illegal and in suppressing the evidence taken from Vieira's apartment as well as his statements.

3. *Discussion.* As identified by the Commonwealth on its appeal, we have before us challenges to the judge's rulings on the stop of the Toyota and the evidence gleaned from that stop, the search of Vieira's apartment, and his statements to the police in the course of the search. We take up each of the Commonwealth's claims separately.

a. *The stop of the black Toyota.* Although the judge referred to the officer's vehicle as "the chase vehicle," his findings show that the officers were following rather than chasing the Toyota. See *Commonwealth* v. *Stoute,* 422 Mass. 782, 788-789 (1996). In determining that the stop of the vehicle was illegal, the judge ruled that the stop was "pretextual" and that the Commonwealth had failed to show by a preponderance of the evidence that G. L. c. 90, § 14B, had been violated. No matter the judge's belief that the stop of the Toyota was a pretext, the law is that the officers' motive for stopping the vehicle is irrelevant, and all that need be shown is that they had a reasonable suspicion that the driver of the Toyota had violated G. L. c. 90, § 14B. See *Commonwealth* v. *Ciaramitaro,* 51 Mass. App. Ct. 638, 643 (2001).

As found by the judge, at least one officer saw that the driver of the vehicle had failed to signal a turn off the road servicing moderate traffic. We conclude that on the facts found by the judge, the officers had reasonable suspicion that a traffic violation had occurred and, therefore, the right to stop the vehicle.

b. *The search of the apartment.* Upon arriving at 79 Oesting Street, the officers "jimm[ied]" open the security door and gained access into the common area.[7] The warrantless and nonconsensual entry into apartment C, however, must be justified by a showing of probable cause *and* exigent circumstances. See *Commonwealth* v. *DeJesus,* 439 Mass. 616, 619 (2003) (*DeJesus*). We conclude, as did the judge based upon his alternative subsidiary findings, that Medeiros's statements to the police at

---

[7]None of the parties argue that the officers' entry into the common area required suppression of the evidence seized from the apartment.

the time of the stop of the Toyota, the contents of the trash bags thrown in the dumpster by Avellar and legally seized by the police after the stop, and the odor of acetone in the foyer of 79 Oesting Street, which grew stronger in the common hallway, were sufficient to show the existence of probable cause to search apartment C.

The more difficult question is whether the circumstances of the warrantless entry into the apartment were based upon a "reasonable belief as to the potential loss or destruction of evidence." *Id.* at 620. On this question the judge concluded that the evidence was insufficient to show a reasonable belief as to the existence of exigent circumstances. We need not decide whether the officers had a reasonable belief on this point because, after securing the premises, the officers sought and obtained a search warrant for the black Toyota and for the apartment at 79 Oesting Street.

> "[R]egardless of the illegality of the entry and initial search, the evidence is admissible as long as the affidavit in support of the application for a search warrant contains information sufficient to establish probable cause to search the defendant's apartment, apart from the observation of cocaine and cocaine distribution materials."

*Id.* at 625.

Based on *DeJesus*, we turn to Ledo's affidavit in support of the application for the search warrant to determine the existence of probable cause without regard to any information he gleaned during the so-called protective sweep of the apartment, that is, a large stack of currency, even though it appears to have been in plain view; a clear plastic bag suspected of containing cocaine; two boxes of plastic sandwich bags; and a large amount of cocaine being heated in the oven.

First, there is the information provided by the "anonymous caller." Although the caller did not relate facts sufficient to satisfy the requirements of *Aguilar* v. *Texas*, 378 U.S. 108, 114 (1964), and *Spinelli* v. *United States*, 393 U.S. 410, 414-415 (1969), the affidavit sets out the details of the independent police corroboration of the tip, and we consider that information in evaluating the sufficiency of the affidavit. See *Commonwealth* v. *Alvarez*, 422 Mass. 198, 208 (1996). Next, Ledo's affidavit

related the facts concerning the stop of the Toyota and Medeiros's statements concerning apartment C and Vieira's occupancy of that apartment. Also set out in the affidavit was the information concerning the seizure of the bags from the dumpster and the results of the examination of the contents found therein, as well as the officers' actions and perceptions upon their entry into the foyer of 79 Oesting Street and apartment C, including the fact that the man therein encountered matched the description given by the anonymous tipster. Disregarding, as we must, Ledo's account of his observations within the apartment concerning the cash, drugs, and drug paraphernalia, the information in the affidavit was quite sufficient to establish probable cause in support of the issuance of the warrant.

c. *Vieira's statements.* It should be recalled that, as found by the judge, after the police entered apartment C, Vieira was handcuffed, seated on a couch in the living room area, and advised of his Miranda rights, to which he responded that he did not wish to speak with the officers. He remained seated on the couch for about two hours while the officers conducted their protective sweep and while Ledo left to secure a search warrant. When Ledo returned with the warrant, Smith showed it to Vieira, who was again advised of his Miranda rights. When Vieira replied that he understood his rights, Smith asked him if he wanted to say anything. At that point, Vieira stated that he wanted to cooperate and proceeded to tell the officers from whom he had obtained cocaine, where in the apartment the police would find contraband, and that Avellar and Medeiros were involved in the rerocking process.

On these facts the judge concluded that (1) because no evidence had been presented concerning Vieira's intelligence and ability to understand English, the Commonwealth had failed to sustain its burden of demonstrating that Vieira's waiver of his Miranda rights was knowingly and intelligently made; (2) the police failed to "scrupulously honor[ ]" Vieira's invocation of his right to remain silent when Smith reinitiated conversation with him after showing him the search warrant and again advising him of his Miranda rights; and (3) the search warrant was not an attenuating circumstance that removed the taint of the illegal search from Vieira's statements.

Accepting the facts as found by the judge, we nonetheless reach a different conclusion. First, there can be no doubt that Vieira was under arrest and in police custody as soon as he was handcuffed and seated on the living room couch. As to whether he knowingly and intelligently waived his right to remain silent at that time, the facts show that he invoked his right not to speak with the police. When, about two hours later, Vieira was shown the search warrant, again advised of his rights, and asked if he understood them, he stated that he did. Vieira presented nothing to contradict these facts, which we think, in the absence of evidence to the contrary, sufficient to show that he knowingly and intelligently waived his right to remain silent.

We are not troubled by the fact that the police, rather than taking the arrested Vieira to the police station, kept him in custody at the apartment while Ledo sought and obtained a search warrant.

> "Generally, police are required to have a copy of the search warrant available at the time of execution to show to the subject of the search (if present), in order to inform him of the police authority to search and the limits on such authority, if any."

Grasso & McEvoy, Suppression Matters Under Massachusetts Law § 7-8(a) (2006-2007). There is nothing that even suggests that Vieira was questioned during that time or that Smith, after showing him the warrant and again advising him of his rights, then interrogated or bargained with him in an effort to elicit a statement. Indeed, the judge specifically found to the contrary. We do not think that Smith's general inquiry whether Vieira wished to say anything constituted "interrogation." See *Commonwealth* v. *Brant*, 380 Mass. 876, 883, cert. denied, 449 U.S. 1004 (1980); *Commonwealth* v. *D'Entremont*, 36 Mass. App. Ct. 474, 479-480 (1994).

Because it was unnecessary for us to consider whether the warrantless entry and "protective sweep" of the premises were permitted, we must take up the question whether Vieira's statements were obtained by "exploiting [an assumed] illegality or [obtained] by means sufficiently distinguishable to dissipate the taint." *Commonwealth* v. *Manning*, 44 Mass. App. Ct. 695, 698

(1998). This question is resolved by looking to the factors set out in *Commonwealth* v. *Bradshaw*, 385 Mass. 244, 258 (1982):

> "[T]he question whether a confession is the product of free will must be resolved by looking at several factors including (1) Miranda warnings, (2) the temporal proximity of the arrest and the confession, (3) the presence of intervening circumstances, and (4) the purpose and flagrancy of the official misconduct."

See *Commonwealth* v. *Chongarlides*, 52 Mass. App. Ct. 366, 375 (2001).[8]

As previously discussed, Vieira was first advised of his Miranda rights before the officers undertook the "protective sweep" during which cocaine was found in an oven. Still, there is nothing to show that this misconduct prompted Vieira to speak. Rather, he remained silent during the next two hours and never once asked to speak with an attorney. It was not until a search warrant was obtained and shown to him that Vieira, again advised of his Miranda rights, decided to cooperate with the police. Consequently, we conclude that on the facts found by the judge there is nothing to show that Vieira's statements were the product of any police misconduct requiring suppression of his statements. See *Commonwealth* v. *Chongarlides*, *supra* at 375.

*4. Conclusion.* It follows from what we have said that the orders suppressing the evidence against the defendants are reversed and that the matters are remanded to the Superior Court for further proceedings.

*So ordered.*

---

[8]Moreover, neither the Commonwealth nor Vieira makes any argument on appeal on the question of his knowing and intelligent waiver. Rather, they focus on the legality of the chain of events that led the officers to the apartment and his arrest.